**United States District Court**
For the Northern District of California

1

2

3

4

5                                  UNITED STATES DISTRICT COURT

6                                  NORTHERN DISTRICT OF CALIFORNIA

7

8    CATLIN SPECIALTY INSURANCE                    No. C-12-0424 EMC
     COMPANY,
9
                    Plaintiff,
10                                                 **ORDER RE PARTIES' CROSS-**
            v.                                     **MOTIONS FOR SUMMARY**
11                                                 **JUDGMENT**
     CAMICO MUTUAL INSURANCE
12   COMPANY,                                      **(Docket Nos. 26, 28)**

13                  Defendant.
     _____/
14

15

16          Plaintiff Catlin Specialty Insurance Company issued an insurance policy to CAMICO Mutual

17   Insurance Company.  Catlin now seeks a declaration that it has no duty to defend or indemnify

18   CAMICO with respect to a claim made against CAMICO by one of its insureds.  Currently pending

19   before the Court are the parties' cross-motions for summary judgment.  The issues raised in both

20   motions are: (1) whether a "Claim" was made against CAMICO as that term is defined in the Catlin

21   policy; and (2) if so, whether CAMICO's insured made a "Claim" within the policy period.

22          In its motion for summary judgment, CAMICO raises an additional issue, *i.e.*, whether any

23   exclusion provision in the Catlin policy is applicable.  However, as Catlin points out, the Court

24   adopted the parties' proposal that summary judgment motions be split into two phases, with the first

25   phase addressing only those issues identified above.  *See* Docket No. 22 (joint CMC statement);

26   Docket No. 23 (civil minutes).  Accordingly, in this order, the Court addresses only those issues, as

27   well as a new issue raised by Catlin in its papers, *i.e.*, whether CAMICO colluded with its insured to

28   create coverage.

**United States District Court**
For the Northern District of California

# I.   FACTUAL & PROCEDURAL BACKGROUND

The evidence submitted by the parties reflects as follows.  Where there are factual disputes and/or evidentiary objections in need of resolution, they are so noted.

A.   CAMICO and Catlin Insurance Policies

CAMICO issued an accountants professional liability insurance policy to an accounting firm, White Zuckerman ("WZ").  *See* Loesch Decl ¶ 12 & Ex. B (CAMICO policy).  The CAMICO policy had a $3 million limit of liability.  *See* Docket No. 29 (Loesch Decl. ¶ 12).

CAMICO, in turn, obtained an insurance agency professional liability policy from Catlin.  *See* Docket No. 29 (Loesch Decl. ¶ 4 & Ex. A) (Catlin policy).  The policy period was from October 1, 2010, to October 1, 2011.  *See* Docket No. 29 (Loesch Decl. ¶ 4).  Under the Catlin policy, Catlin agreed to pay CAMICO "**Loss** which [it] becomes legally obligated to pay because of a **Claim** that is both made against the [CAMICO] and reported to [Catlin] in writing during the **Policy Period** . . . for a **Wrongful Act** committed [by CAMICO] solely in the rendering or failing to render **Professional Services** for a **Client**."  Docket No. 29 (Loesch Decl. ¶ 6 & Ex. A at CATLN 0051) (Catlin policy).  "**Claim**" is defined in the policy as "a written demand received by [CAMICO] for monetary damages . . . for an actual or alleged **Wrongful Act**."  Docket No. 29 (Loesch Decl. ¶ 7 & Ex. A at CATLN 0052) (Catlin policy).

B.   *Yang* Lawsuit Against WZ

In 2001, a lawsuit was filed against (among others) CAMICO's insured, WZ, an accounting firm.  This lawsuit shall hereinafter be referred to as the *Yang* action.  *See* Docket No. 29 (Loesch Decl. ¶ 13).  CAMICO describes the facts underlying the *Yang* suit as follows:

> In 2000, White Zuckerman conducted a forensic accounting investigation for a client then known as Katy Yang in preparation for her divorce from Paul Yang.  White Zuckerman and Katy Yang were thereafter sued by Paul Yang and his companies in 2001 (Yang Lawsuit) for their efforts in gathering evidence of community property for the divorce of Yang and his wife.

Docket No. 35 (Opp'n at 1).  CAMICO agreed to defend White Zuckerman in the *Yang* action.  *See* Docket No. 29 (Loesch Decl. ¶ 14).

**United States District Court**
For the Northern District of California

1   WZ did not prevail in the *Yang* action.  In November 2008, the jury returned a verdict in

2   favor of the plaintiffs, awarding them $3.4 million in damages against WZ.  *See* Docket No. 29

3   (Loesch Decl. ¶ 15).  As noted above, CAMICO's insurance policy had a limit of liability of $3

4   million.

5        A decision was made to appeal the *Yang* verdict.  In February 2009, CAMICO signed and

6   delivered a warranty statement to a bonding company for an appellate bond in the *Yang* lawsuit.  *See*

7   Docket No. 29 (Loesch Decl. ¶ 16).  This undertaking was made to stay enforcement of the money

8   judgment pending appeal.  *See* Cal. Code Civ. Proc. § 917.1.  The appellate bond totaled $5.4

9   million.  *See* Docket No. 29 (Loesch Decl. ¶ 16).  The amount of the bond was set under California

10  Code of Civil Procedure § 917.1(b), which provides that "[t]he undertaking shall be for double the

11  amount of the judgment or order unless given by an admitted surety insurer in which event it shall

12  be for one and one-half times the amount of the judgment or order."  Cal. Code Civ. Proc. §

13  917.1(b).  Ultimately, the appellate court affirmed, and the California Supreme Court declined to

14  take up the case for further appeal.  *See* Docket No. 29 (Loesch Decl. ¶¶ 18-19).

15  C.    WZ Letter of August 24, 2010

16       While the *Yang* action was still pending before the appellate court, WZ – acting through its

17  counsel David B. Parker – contacted CAMICO about trying to settle the *Yang* suit.  More

18  specifically, on August 24, 2010, Mr. Parker wrote a letter to CAMICO in which he discussed the

19  risks of not settling the action.  *See* Docket No. 29 (Loesch Decl., Ex. G) (letter).

20       Mr. Parker began by noting that CAMICO had "previously rejected an opportunity to settle

21  at policy limits" and that WZ had not been asked to consent to a policy limits payment.  Docket No.

22  29 (Loesch Decl., Ex. G at CATLN 1035) (letter).  Mr. Parker then went on to state that, if the

23  judgment were affirmed by the appeals court, ultimately CAMICO would have to pay the bonding

24  company and "we seriously question whether CAMICO has legal recourse against White

25  Zuckerman" since, "[w]hen the bond was posted, [WZ was] not asked to agree, did not agree, and

26  [was] not warned that [it] may have liability for an amount in excess of the policy limits."  Docket

27  No. 29 (Loesch Decl., Ex. G at CATLN 0136) (letter).  Mr. Parker added that, "even if CAMICO

28  has the legal right to seek reimbursement for the excess (easily more than $3 million), White

United States District Court
For the Northern District of California

1  Zuckerman does not have the capacity to pay such a demand" and thus would either dissolve or seek

2  bankruptcy protection.  Docket No. 29 (Loesch Decl., Ex. G at CATLN 0136) (letter).  Mr. Parker

3  concluded by stating: "*For these reasons, we hope CAMICO makes its decisions with full awareness*

4  *of all existing risks, including the inevitably that it will pay the judgment and the risk that it will not*

5  *be able to shift much if any of that judgment to [WZ].*"  Docket No. 29 (Loesch Decl., Ex. G at

6  CATLIN 0136) (letter) (emphasis added).

7  D.    WZ Letter of September 10, 2010

8        CAMICO responded to Mr. Parker's letter on September 7, 2010.  *See* Docket No. 29

9  (Loesch Decl., Ex. I ) (letter).  Mr. Parker then replied by letter on September 10, 2010.  *See* Docket

10  No. 29 (Loesch Decl., Ex. J) (letter).

11       In the September 10 letter, Mr. Parker "recognize[d] that the only opportunity to settle within

12  policy limits presented itself shortly before the trial and the case did not settle.  The issue of whether

13  [WZ] was properly informed and advised will have to abide further developments."  Docket No. 29

14  (Loesch Decl., Ex. J at CATLN 0142) (letter).  Mr. Parker added, however, that CAMICO should

15  now

16        act proactively by offering the balance of the policy limits.  You may
          believe that the offer will be rejected but you cannot know without at
17        least trying to take this step to protect [WZ].  The worst that can
          happen is that the offer is ignored; more likely there will be a counter
18        offer and, if so, [WZ] will definitely look closely at the possibility of a
          meaningful contribution.

19

20  Docket No. 29 (Loesch Decl., Ex. J at CATLN 0142-43) (letter) (emphasis omitted).

21       Mr. Parker then turned to the issue of the bond: "CAMICO posted the bond, as well it was

22  required to do.  What we are saying, quite simply, is that even if CAMICO has a legal basis to seek

23  contribution to the judgment by [WZ], there is no realistic scenario where that will happen.  The

24  firm would have no choice but to dissolve."  Docket No. 29 (Loesch Decl., Ex. J at CATLN 0143)

25  (letter).  Mr. Parker concluded by stating: "*Please make a policy limits offer.*"  Docket No. 29

26  (Loesch Decl., Ex. J at CATLN 0143) (letter) (emphasis in original).

27       The Catlin policy did not kick in until October 1, 2010, *i.e.*, several weeks after this letter

28  from Mr. Parker.  The policy period extended from October 1, 2010, to October 1, 2011.

**United States District Court**
For the Northern District of California

E.     Notice of Claim by CAMICO

Ultimately, CAMICO did not make a policy limits offer to the plaintiffs in the *Yang* action, as requested by Mr. Parker.  *See* Docket No. 29 (Loesch Decl., Exs. J-K) (letters).  More than half a year passed.  Then, on June 20, 2011, the California Court of Appeal affirmed the judgment of the trial court in the *Yang* lawsuit.  *See* Docket No. 29 (Loesch Decl. ¶ 18).  A few days later, Mr. Parker sent a letter to CAMICO stating that, "[i]nasmuch as the judgment is bonded by CAMICO and is CAMICO's sole responsibility, it is for CAMICO to determine what steps, if any, to take in challenging the Court of Appeal decision."  Docket No. 29 (Loesch Decl., Ex. P at CATLN 0007) (letter).

Approximately a month later, on July 29, 2011, CAMICO sent to Catlin an e-mail, notifying it that there were "circumstances which may give rise to a claim under [the Catlin policy]."  Docket No. 29 (Loesch Decl., Ex. P at CATLN 0003) (e-mail).  CAMICO informed Catlin of Mr. Parker's position that WZ

> would not repay CAMICO for any payment in excess of remaining limits.
>
> We have advised [WZ] that we dispute this interpretation.  We expect [WZ] to respond reiterating they have no exposure excess of Policy Limits and, in that regard, *it is possible they may allege bad faith [by CAMICO] in order to argue CAMICO has an exposure in excess of the Policy Limits.*
>
> . . . . *[W]e have concerns that the decision to reject [WZ's] demand to tender the Policy Limits in September/October 2010 may result in an exposure to CAMICO in excess of the $3M Policy Limits based on our claims handling . . . .* We also have concerns about the decision of the former Vice President of Claims at CAMICO to authorize posting an appeal bond in excess of the remaining policy limits.

Docket No. 29 (Loesch Decl., Ex. P at CATLN 0006) (memo) (emphasis added).

F.     August 2011 Communications Between WZ and CAMICO

On August 4, 2011, CAMICO's coverage counsel (also litigation counsel of record), Gilbert D. Jensen, sent a letter to Mr. Parker, stating that he wanted to set up a further settlement discussion with the *Yang* plaintiffs.  In the same letter, Mr. Jensen took note that, in prior correspondence with CAMICO, Mr. Parker had stated that the appeal was not bonded with the explicit consent of WZ.

United States District Court
For the Northern District of California

1    Mr. Jensen pointed out, however, that, under the CAMICO policy, "'[i]f the Company has paid any

2    amount in settlement or satisfaction of *Damages* or *Claim Expenses* in excess of the applicable limit

3    of liability . . . , the *Insureds*, jointly and severally, shall be liable to the Company for any and all

4    such amounts.'"  Docket No. 26 (Loesch Decl., Ex. M) (letter) (emphasis in original).

5        On August 4, Mr. Jensen also sent an e-mail to Mr. Parker, in which he stated that he "would

6    like to chat about how to conclude this matter when you have a chance."  Docket No. 33 (Foy Decl.,

7    Ex. A) (e-mail).  It appears that Mr. Jensen and Mr. Parker did have a conversation and, on August

8    10, 2011, Mr. Parker sent an e-mail to Mr. Jensen, in which he attached a draft letter from himself to

9    Mr. Jensen.  Mr. Parker stated in the e-mail: "Accept this [draft letter] for now as a settlement

10   communication as it is in draft [form] and a preclude [sic] to our meeting later today."  Docket No.

11   33 (Foy Decl., Ex. C) (e-mail).  The draft letter stated, *inter alia*, that the CAMICO policy clearly

12   covered the *Yang* lawsuit and that the only issue remaining was whether CAMICO would be

13   reimbursed for payments made in excess of policy limits.  *See* Docket No. 33 (Foy Decl., Ex. C)

14   (draft letter).

15       The August 10 meeting was attended by Mr. Jensen (on behalf of CAMICO), Mr. Parker (on

16   behalf of WZ), and the principals of WZ.  According to CAMICO, during the meeting, WZ claimed

17   error by CAMICO in its claims handling of the *Yang* lawsuit.  *See* Docket No. 26 (Jensen Decl. ¶ 5).

18   For example, WZ asserted that "CAMICO had had three opportunities to settle the Yang Lawsuit

19   within the policy limits of the CAMICO policy and that by failing to do so was responsible for any

20   excess of limits liability."[1]  Docket No. 26 (Parker Decl. ¶ 10).

21       The next day, on August 11, 2012, Mr. Parker sent a revised draft letter to Mr. Jensen.  In the

22   revised draft, Mr. Parker included new language about CAMICO's handling of the case:

23           As for CAMICO's anticipatory claims for reimbursement of
             sums paid above the policy limits, we have disputed the claim based
24           on the policy and on the lack of insured consent or agreement to pay
             an excess occasioned by an indemnity demand from the bonding

25   _____

26       [1]  Catlin has objected to these portions of the Jensen and Parker declarations on the basis that
     the present-day characterizations of past events are irrelevant.  *See* Docket No. 32 (Opp'n at 25).
27   The objection is overruled.  Mr. Jensen and Mr. Parker are simply providing their version of what
     took place in the past.  The Court notes, however, that its ruling on this objection has no effect on
28   the Court's conclusion that Catlin is entitled to summary adjudication.

> company, but we have also challenged CAMICO's handling of the case which caused the judgment in the first place.

Docket No. 33 (Foy Decl., Ex. D) (draft letter). Mr. Parker went on to give examples of how CAMICO had improperly handled the case – *e.g.*, by not getting consent from WZ on major decisions and by twice rejecting settlement demands less than policy limits. *See* Docket No. 33 (Foy Decl., Ex. D) (draft letter).

Thereafter, on August 15, 2011, Mr. Parker sent the finalized letter to Mr. Jensen. *See* Docket No. 33 (Foy Decl., Ex. E) (e-mail). This letter contained the same language as above regarding CAMICO's claims handling:

> As for CAMICO's anticipatory claims for reimbursement of sums paid above the policy limits, we have disputed the claim based on the policy and the lack of insured consent or agreement to pay an excess occasioned by an indemnity demand from the bonding company, but we have also challenged CAMICO's handling of the case which caused the judgment in the first place.
>
> *First, major decisions were made in the case at the direction of CAMICO for which there was either no consultation at all or no meaningful participation and informed consent on the part of the insureds [WZ]. . . .*
>
> *Second, CAMICO breached its duties to the insureds [WZ] in twice rejecting settlement demands less than policy limits prior to trial (four years apart, in 2004 and 2008). . . .*

Docket No. 29 (Loesch Decl., Ex. N at 0714) (letter) (emphasis in original).

On August 16, 2011, Mr. Parker sent an e-mail to Mr. Jensen in which he stated as follows: "I am working on a letter to correct the contents of my letter yesterday and to use the new information you kindly shared to work on new angles for the mutual benefit of CAMICO and White Zuckerman." Docket No. 33 (Foy Decl., Ex. F) (e-mail).

G.   WZ Letter of September 20, 2011

On September 16, 2011, Mr. Parker sent an e-mail to Mr. Jensen, asking in essence for his comments on a draft letter from Mr. Parker to Mr. Jensen. *See* Docket No. 33 (Foy Decl., Ex. G) (e-mail). The finalized letter (vastly truncated) was sent on September 20, 2011. *See* Docket No. 33 (Foy Decl., Ex. H) (e-mail). In the finalized letter, Mr. Parker stated the following:

United States District Court
For the Northern District of California

1
2
3
4
5

> For the sake of good order and to confirm in writing our
> discussions, on behalf of CAMICO's insureds, the White Zuckerman
> firm, we demand that CAMICO take all steps necessary to protect and
> indemnify White Zuckerman from any and all judgments, costs,
> charges or expenses associated with the [*Yang*] litigation. This
> specifically means that if the judgment is affirmed by the Supreme
> Court, that the judgment is paid directly by or by means of the bonding
> company, *without recourse* against the insureds . . . .

6   Docket No. 29 (Loesch Decl., Ex. O at CATLN 0152) (letter) (emphasis added).

7       Two days later, CAMICO sent a letter to Catlin, stating that WZ's "threatened claims have

8   ripened into a demand." Docket No. 29 (Loesch Decl., Ex. R at CATLN 0080) (letter).

9   H.      Settlement Between WZ and CAMICO

10      Eventually, in December 2011, WZ and CAMICO resolved their dispute. *See* Docket No. 26

11  (Jensen Decl. ¶ 10). Under the settlement, WZ partially reimbursed CAMICO for the amount it had

12  to pay in excess of the *Yang* judgment. *See* Docket No. 26 (Parker Decl. ¶ 15).

13      On December 16, 2011, CAMICO advised Catlin of the settlement. *See* Docket No. 30

14  (Brown Decl., Ex. F at CATLN 0322) (letter). On December 30, 2011, Catlin advised CAMICO

15  that it would accept the defense of CAMICO under a full reservation of rights. *See* Docket No. 30

16  (Brown Decl., Ex. H at CATLN 0434) (letter).

17                                      **II.   DISCUSSION**

18  A.      Legal Standard

19      Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if

20  the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

21  affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

22  party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is genuine

23  only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See*

24  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of

25  evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for

26  the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in

27  the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the

28  nonmovant's favor. *See id.* at 255.

1    Where a party has the ultimate burden of proof, it may prevail on summary judgment only if

2    it affirmatively demonstrates that there is no genuine dispute as to every essential element of its

3    claim.  *See River City Mkts., Inc. v. Fleming Foods W., Inc.*, 960 F.2d 1458, 1462 (9th Cir. 1992).

4    The party who does not have the ultimate burden of proof may prevail on a motion for summary

5    judgment simply by pointing to the other party's failure "to make a showing sufficient to establish

6    the existence of an element essential to that party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317,

7    322 (1986).

8        In the instant case, both parties are moving for summary judgment.  Catlin is moving for

9    summary judgment on the basis that there is no coverage under the Catlin policy; CAMICO is

10   moving for summary judgment on the basis that there is coverage and that no exclusionary clauses

11   are applicable.

12       Under California law, "the burden is on the insured initially to prove that an event is a claim

13   within the scope of the basic coverage" while "the burden is on the insurer to prove a claim covered

14   falls within an exclusion."  *Aeroquip Corp. v. Aetna Casualty & Sur. Co.*, 26 F.3d 893, 895 (9th Cir.

15   1993) (internal quotation marks omitted).  Thus, the burden is on CAMICO to establish coverage

16   and on Catlin to establish the application of an exclusionary clause.  As noted above, the motions to

17   summary judgment shall be confined only to the coverage issues and not the issues related to the

18   exclusionary clauses.

19       Catlin argues that there was no coverage for the *Yang* suit under the Catlin policy because (1)

20   CAMICO did not sustain a loss as a result of an allegedly wrongful act but rather as a result of a

21   contractual obligation; and (2) even if CAMICO sustained a loss as a result of an allegedly wrongful

22   act, WZ never made a claim to CAMICO within the Catlin policy period.

23   B.    Wrongful Act v. Contractual Obligation

24       Under the Catlin policy, Catlin agreed to pay CAMICO "**Loss** which [it] becomes legally

25   obligated to pay because of a **Claim** that is both made against the [CAMICO] and reported to

26   [Catlin] in writing during the **Policy Period** . . . for a **Wrongful Act** committed [by CAMICO]

27   solely in the rendering or failing to render **Professional Services** for a **Client**."  Docket No. 29

28   (Loesch Decl. ¶ 6 & Ex. A at CATLN 0051) (Catlin policy).  Under the policy, "**Client** means an

United States District Court

For the Northern District of California

1   individual, company or entity for whom or which an **Insured** renders **Professional Services** to gain

2   monetary compensation."  Docket No. 29 (Loesch Decl., Ex. A at CATLN 0052) (Catlin policy).

3   "**Wrongful Act** means a negligent act, error or omission committed by an **Insured** . . . solely in the

4   rendering of or failing to render **Professional Services**."  Docket No. 29 (Loesch Decl., Ex. A at

5   CATLN 0056) (Catlin policy).

6           In its papers, Catlin argues that CAMICO suffered a loss not because of an allegedly

7   wrongful act that it committed but rather because of a contractual obligation that it voluntarily

8   accepted – *i.e.*, the appellate bond.[2]  Catlin admits that it has no authority directly on point to support

9   its position but argues that "there is significant authority confirming that amounts paid by an insured

10  pursuant to a contract . . . are not covered under a professional liability policy."  Docket No. 28

11  (Mot. at 20).

12          Catlin is correct that there is case law holding that, where a party is contractually obligated to

13  pay a debt, that debt is "voluntarily accepted" by the party and not "a loss resulting from a wrongful

14  act within the meaning of [an insurance] policy."  *August Entertainment, Inc. v. Philadelphia Indem.*

15  *Ins. Co.*, 146 Cal. App. 4th 565, 581-82 (2007).  In *August*, the court held that, where a party refuses

16  to satisfy a contractual obligation (*e.g.*, breaches a contract), that does not thereby convert the

17  party's conduct into a wrongful act.  "'To hold otherwise would allow an insured to turn all of its

18  legal liabilities into insured events by the intentional act of refusing to pay them.'"  *Id.* at 578.

19  Moreover, "[t]o hold the insurer liable for the contract price would be tantamount to making it a

20  _____

21          [2]  There is also an exclusionary clause to the same effect.

22          This Policy shall not apply to and [Catlin] shall not pay **Loss** for any
        **Claim**:

23          . . . .

24          (H)    arising out of, based upon or in consequence of, directly or
                indirectly resulting from or in any way involving any actual
25                     or alleged liability of others assumed by [CAMICO]
                under an agreement, contract, guaranty, or warranty unless
26          [CAMICO] would be liable in the absence of such agreement,
                contract, guaranty or warranty.

27

28  Docket No. 29 (Loesch Decl., Ex. A at 0057) (Catlin policy).  This is one of the exclusionary clauses
    that will be at issue if the Court determines that there is coverage.

United States District Court
For the Northern District of California

1   business partner of [the insured], which was not the mutual intention of the insurer and the insured

2   under the policy." *Id.* at 569.

3        The problem for Catlin is that the above principle has no application to the case at bar.  Here,

4   CAMICO did not ask Catlin for coverage because CAMICO failed to satisfy a contractual obligation

5   with the bonding company.  Indeed, there is no indication that Catlin failed to satisfy a contractual

6   obligation with the bonding company.  *See* Docket No. 36 (Jensen Decl. ¶ 6) (stating that "[t]he

7   Bonding Company was not required to make any payment on the Undertaking and CAMICO was

8   not requested to make any payment with respect to its indemnity agreement with the Bonding

9   Company").  Rather, CAMICO asked Catlin for coverage because, as claimed by WZ (CAMICO's

10  client), CAMICO had improperly rendered professional services – *e.g.*, (1) by improperly failing to

11  consult with WZ before taking out the appellate bond and (2) by failing to settle within policy limits

12  prior to trial.  These constitute wrongful acts, not failures to comply with contractual obligations.

13  As a result of WZ's claim of wrongful conduct against CAMICO, CAMICO could not recover from

14  WZ all the monies it paid in excess of the policy limits as it otherwise could have.

15        In its papers, Catlin repeatedly argues that CAMICO "obligated itself to fund the judgment

16  [in the *Yang* lawsuit] by posting the appellate bond," Docket No. 32 (Opp'n at 15), but what Catlin

17  fails to take into account that this was only an obligation vis-a-vis the bonding company.  There was

18  never an agreement between CAMICO and WZ that CAMICO would pay for anything above the

19  policy limits – *i.e.*, CAMICO did not by virtue of the appellate bond give up its right to go after WZ

20  under the CAMICO policy; the policy gave CAMICO the right to seek reimbursement from WZ for

21  anything above the policy limits.  That CAMICO took out a bond and later had to pay the bond

22  company or pay the *Yang* judgment directly is inconsequential to the alleged loss CAMICO suffered

23  here – the inability to obtain full reimbursement from WZ as a result of WZ's claim of wrongful

24  conduct.

25        Accordingly, the Court rejects Catlin's argument that there is no coverage because CAMICO

26  never suffered a loss as a result of an allegedly wrongful act.

27  ///

28  ///

11

C.      Claim During the Policy Period

        "**Claim**" is defined in the Catlin policy as "a written demand received by [CAMICO] for monetary damages . . . for an actual or alleged **Wrongful Act**."  Docket No. 29 (Loesch Decl. ¶ 7 & Ex. A at CATLN 0052) (Catlin policy).  In order for there to be coverage, the claim must be one made against the insured (*i.e.*, CAMICO) during the policy period – October 1, 2010, to October 11, 2011.  *See* Docket No. 29 (Loesch Decl. ¶ 6 & Ex. A at CATLN 0051).  The Catlin policy further provides that

> All **Claims** based upon or arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be considered a single **Claim** and each such single **Claim** shall be deemed to have been made on the earlier of the following: (A) when the earliest **Claim** arising out of such **Wrongful Act** or **Interrelated Wrongful Acts** was first made; or (B) when notice was provided to [CAMICO] pursuant to Section VIII.B. herein concerning a **Wrongful Act** giving rise to such **Claims**."

Docket No. 29 (Loesch Decl. ¶ 11 & Ex. A at CATLN 0060) (Catlin policy).

        In its papers, Catlin argues that, even if CAMICO suffered a loss as a result of an allegedly wrongful act, WZ never presented a claim to CAMICO within the Catlin policy period.  According to Catlin, either (1) a claim was first presented *prior* to the policy period or (2) the alleged claim presented within the policy period was not in fact a claim because it did not demand monetary damages.

        1.      WZ Letters of August 24 and September 10, 2010

        Catlin contends that WZ first made a claim to CAMICO either on August 24 or September 10, 2010, by virtue of letters that Mr. Parker sent to CAMICO on behalf of WZ.  If either one of these letters was in fact a claim, then, under the "single claim" provision quoted above, any subsequent claim based on the same or interrelated wrongful act would relate back to the pre-policy claim and be barred from coverage.

        To evaluate Catlin's argument, the Court must begin by addressing what a claim is.  As noted above, under the Catlin policy, a claim is "a written demand received by [CAMICO] for monetary damages . . . for an actual or alleged **Wrongful Act**."  Docket No. 29 (Loesch Decl. ¶ 7 & Ex. A at CATLN 0052) (Catlin policy).  This definition of claim is consistent with how courts have

United States District Court

For the Northern District of California

1  interpreted the term in cases involving insurance policies. For example, in *Abidafel v. Cigna*

2  *Insurance Co.*, 8 Cal. App. 4th 145 (1992), the court defined claim in the following ways: (1) "a

3  demand for something as a right or due"; (2) "the assertion of a liability of the party, demanding that

4  the party perform some service or pay some money"; and (3) "a demand or challenge of something

5  as a right, . . . . assert[ing] the liability of the party from whom a service or sum of money is

6  requested." *Id.* at 160.

7       Notably, the court in *Abidafel* also gave examples of what is *not* a claim: "a request for an

8  explanation, the expression of dissatisfaction or disappointment, mere complaining, or the lodging of

9  a grievance [without a demand for compensation]." *Id.*[3]; *see also Hill v. Physicians & Surgeons*

10  *Exchange*, 225 Cal. App. 3d 1, 5-6 (1990). The court also indicated that "'[a] claim that a wrongful

11  act has occurred is not the same thing as a claim for payment on account of a wrongful act.'" *Id.* at

12  165. In *Hill*, the court gave another example what is not a claim, stating that "the fact [the insured]

13  may have been aware of [his client's] injury is not sufficient to constitute a claim because [a] claim

14  connotes an assertion of a legal right, as distinguished from a recognition of that right." *Hill*, 225

15  Cal. App. 3d at 6 (internal quotation marks omitted).

16       The following cases provide some guidance as to how courts have applied the above

17  principles.

18       •    *Phoenix Insurance Co. v. Sukut Construction Co.*, 136 Cal. App. 3d 673 (1982). In

19  *Phoenix*, an attorney obtained an insurance policy in effect from January 4, 1975, to January 6,

20  1975. The attorney executed a mechanic's lien for a client. In 1975, *i.e.*, within the policy period,

21  "[the client] discovered that because of the narrow drafting, the lien might inadequately protect

22  him." *Id.* at 675. The client informed the attorney of such and asked him "to work without pay to

23  correct the problem with the lien. [The attorney] agreed subject to three conditions. Because [the

25  _____

       [3] In *Abidafel*, the court also stated that, under the policy at issue, a claim is not "threatened
26  action, accusation of misconduct, or mere notice of an intention to hold an insured responsible for a
    wrongful act" but this was informed by the fact that the policy – while it did not define the word
27  "claim" – did define the term "potential claim." *Abidafel*, 8 Cal. App. 4th at 161. More specifically,
    the policy defined potential claim as "'notice from any party that it is the intention of such party to
    hold the Insureds responsible for the results of any specified Wrongful Act done by the Insureds.'"
28  *Id.* Unlike *Abidafel*, the policy in the case at bar does not refer to "potential claims."

13

United States District Court
For the Northern District of California

1    client] would not accept the conditions, [the attorney] did nothing more on the case." *Id.*  A year

2    later, *i.e.*, outside the policy period, the client told the attorney by letter that "he was holding him

3    responsible for damages resulting from the defective lien." *Id.* at 676.  The question for the court

4    was whether the 1975 communication from the client to the attorney – *i.e.*, the communication

5    within the policy period – constituted a claim.  The court concluded that it was a claim: "Here a

6    claim was made against [the attorney], when at the December 9, 1975, meeting, [the client] asked

7    him to work for free to cure the problems created by the mechanics lien's inadequacies.  [¶] This

8    was not a request for an explanation as was the case in *Hoyt v. St. Paul Fire and Marine Ins. Co.*

9    (9th Cir. 1979) 607 F.2d 864 (letter asking attorney to explain why he had client exercise a power of

10   appointment held not to be a claim).  Here further actions, not explanations were sought by the

11   client.  Nor was it a request for new services; it was a demand that [the attorney] correct and

12   complete work for which payment had already been made.  That [the client] did not insist when [the

13   attorney] refused to render assistance does not change the fact that a claim was made." *Id.* at 677-

14   78.

15        •    *Westrec Marina Mgmt., Inc. v. Arrowood Indem. Co.*, 163 Cal. App. 4th 1387 (2008).

16   In *Westrec*, the company had an insurance policy in effect from July 1, 2003, to July 4, 2003.  One

17   of its employees asserted that she had been subjected to discrimination.  The question for the court

18   was whether a letter from the employee's attorney – provided within the policy period – constituted

19   a claim, which was defined in the policy as, *inter alia*, "'a written demand for civil damages or other

20   relief.'" *Id.* at 1389.  In the letter at issue, the attorney claimed that the employee had been subjected

21   to discrimination, stated that she had received right-to-sue letters from DFEH, and explained that "'I

22   am writing to you to see if [the company] would prefer to resolve or mediate this matter, or if it will

23   be necessary to file a lawsuit and have a jury decide the outcome. . . . Before any litigation becomes

24   necessary, . . . I believe the Company should first be permitted to do the right thing to promptly

25   rectify the harm caused to [the employee] in a confidential and discreet manner.'" *Id.* at 1390.  The

26   court concluded that this was a claim.  "We construe the letter as a settlement demand seeking

27   monetary compensation for the alleged wrongdoing.  Although the letter did not expressly demand

28   payment or refer to any specific amounts, its meaning was clear that, absent some form of negotiated

**United States District Court**

For the Northern District of California

1    compensation, [employee] would commence a lawsuit against [the company].  The attorney's

2    request for compensation while threatening litigation was a 'demand' as that word is ordinarily

3    understood." *Id.* at 1393.

4         •   *Abidafel*, 146 Cal. App. 4th at 565.  In *Abidafel*, a bank had a directors and officers

5    liability policy effective from September 5, 1984, to September 5, 1985.  One of the questions for

6    the court was whether a letter from a government agency to the bank – provided within the policy

7    period – constituted a claim (a term not specifically defined within the policy).  The agency's letter

8    to the bank informed it that "it was in less than satisfactory condition and requested confirmations,

9    reports, progress reports, and corrective actions on certain statutory violations.  The letter stated:

10   'We would appreciate receiving a reply to [an] Examination Report prior to July 25, 1985.'"  *Id.* at

11   166.  The court held that the letter did not constitute a claim.  "None of these requests constituted

12   demands for services or sums of money.  They did not threaten any formal consequences against the

13   former [bank] directors for failure to correct the deficiencies, nor propose to hold the former

14   directors personally liable.  They are notice of specific behavior or acts which could subsequently

15   give rise to a claim against plaintiffs if not corrected."  *Id.* at 166.

16        Taking into account the above authority, the Court rejects Catlin's contention that WZ's

17   letters of August 24 and September 10, 2010, constituted claims.  A reasonable jury could not find

18   that either letter was a claim, as that term is defined in the policy.

19        The August 24 letter did not contain any demand for monetary damages.  Rather, in the

20   letter, WZ simply informed CAMICO that there were risks to not settling the *Yang* lawsuit.  *See*

21   Docket No. 29 (Loesch Decl., Ex. G at CATLN 0137) (stating that "we hope CAMICO makes its

22   decisions with full awareness of all existing risks").  While WZ did reference wrongful conduct by

23   CAMICO – *i.e.*, CAMICO's failure to get WZ's consent before taking out the bond, *see* Docket No.

24   29 (Loesch Decl., Ex. G at CATLN 0136) – "'[a] claim that a wrongful act has occurred is not the

25   same thing as a claim for payment on account of a wrongful act.'"  *Abidafel*, 8 Cal. App. 4th at 165.

26        In its papers, Catlin tries to argue that this case is like *Westrec* and *Phoenix* because, here, as

27   in those cases, WZ was asking CAMICO to resolve and correct a problem.  *See* Docket No. 32

28   (Opp'n at 21) (arguing that the August 24 letter "should be construed as [a] request that CAMICO

United States District Court

For the Northern District of California

1  resolve the *Yang* lawsuit at a time when all of the parties understood that the matter would not settle

2  within policy limits"). But Catlin has vastly oversimplified the analysis in those cases. As indicated

3  above, what was critical to the court in *Westrec* was that it was clear from the attorney's letter that,

4  "absent some form of negotiated compensation, [the employee] would commence a lawsuit against

5  [the company]." *Westrec*, 163 Cal. App. 4th at 1393. As for *Phoenix*, there, the attorney's client

6  "asked him to work for free to cure the problems created by the mechanics lien's inadequacies" –

7  *i.e.*, the client demanded that the attorney "correct and complete work for which payment had

8  already been made." *Phoenix*, 136 Cal. App. 3d at 677-78. Here, WZ simply noted, in the August

9  24 letter, that CAMICO might not have legal recourse against WZ on the amount in excess of the

10 policy limits, in part because WZ did not have the money as a practical matter. WZ did not, at that

11 point, make any demand that CAMICO pay the amount in excess without legal recourse against WZ.

12 *See* Docket No. 29 (Loesch Decl., Ex. G at CATLN 1036) (stating that "we seriously question

13 whether CAMICO has legal recourse against White Zuckerman" and that, "even if CAMICO has the

14 legal right to seek reimbursement for the excess . . . , White Zuckerman does not have the capacity

15 to pay such a demand"). WZ did not assert that CAMICO had any legal obligation above and

16 beyond payment of the policy limits – there was no claim of a breach and a demand for

17 compensation or value.

18         The analysis with respect to the September 10 letter is similar. The point of WZ's September

19 10 letter was to ask CAMICO to "act proactively by offering the balance of the policy limits,"

20 Docket No. 29 (Loesch Decl., Ex. H at CATLN 0142) (emphasis omitted); it did not make a demand

21 for extracontractual monetary damages. Nowhere did WZ demand that CAMICO pay for the

22 amount in excess of the policy limits without recourse to WZ. At most, WZ simply reiterated that

23 any recourse against it would essentially be futile. *See* Docket No. 29 (Loesch Decl., Ex. H at

24 CATLN 0143) (stating that, "even if CAMICO has a legal basis to seek contribution to the judgment

25 by the insureds, there is no realistic scenario where that will happen"). WZ also stated that, if

26 CAMICO were to make a policy limits offer, then the *Yang* plaintiffs would likely make a counter-

27 offer, in which case WZ would "look closely at the possibility of a meaningful contribution."

28

United States District Court

For the Northern District of California

1  Docket No. 29 (Loesch Decl., Ex. H at CATLN 0143).  If anything, this indicates that WZ was not

2  yet demanding that CAMICO pay for the amount in excess of the policy limits.

3          2.      WZ Letter of September 20, 2011

4          Catlin argues that, even if WZ's letters of August 24 and September 10, 2010, should not be

5  considered claims, the Court should still reject CAMICO's contention that WZ's letter of September

6  20, 2011, did constitute a claim.  According to Catlin, all that WZ did in the letter was "set forth its

7  expectation that CAMICO fund the judgment if that judgment is affirmed by the California Supreme

8  Court.  An expectation that CAMICO fund the judgment, if affirmed, is not the equivalent of a

9  'written demand . . . for monetary damages' as required by the Catlin Policy."  Docket No. 32

10  (Opp'n at 13).

11         Catlin's argument is not persuasive.  As CAMICO asserts, Catlin glosses over the exact

12  language used by WZ in its September 20 letter:

13              *[W]e demand that CAMICO take all steps necessary to protect and
                 indemnify White Zuckerman from any and all judgments, costs,*
14              *charges or expenses associated with the [Yang] litigation.*  This
                 specifically means that if the judgment is affirmed by the [California]
15              Supreme Court, that the judgment is paid directly or by means of the
                 bonding company, *without recourse against the insureds . . . .*
16

17  Docket No. 29 (Loesch Decl., Ex. O at CATLN 1052).  Moreover, the September 20 letter must be

18  taken in context.  This letter was preceded by a letter from WZ to CAMICO, dated August 15, 2011,

19  which asserted that WZ was not obligated to reimburse CAMICO for the amount in excess of the

20  policy limits because, *inter alia*, CAMICO failed to consult WZ prior to taking out the bond and

21  failed to handle WZ's claim appropriately (*e.g.*, by twice rejecting settlement demands less than

22  policy limits).  *See* Docket No. 29 (Loesch Decl., Ex. N at CATLN 0714) (letter).  Thus, the

23  September 20 letter makes clear for the first time WZ's assertion of CAMICO's liability for

24  wrongful conduct, coupled with a demand for full indemnification without recourse against WZ.

25  This is the first time WZ clearly asserted that CAMICO was liable for payments beyond the policy

26  limit.

27         Catlin protests still that, under *Abidafel*, the September 20 letter could not be considered a

28  claim as, there, the court stated that a claim is not "threatened action, accusation of misconduct, or

17

1    mere notice of an intention to hold an insured responsible for a wrongful act." *Abidafel*, 8 Cal. App.

2    4th at 161.  However, as indicated in note 4, *supra*, this statement in *Abidafel* must be taken in

3    context.  In *Abidafel*, the policy at issue did not define the word "claim" but did define the term

4    "potential claim."  More specifically, the policy defined potential claim as "'notice from any party

5    that it is the intention of such party to hold the Insureds responsible for the results of any specified

6    Wrongful Act done by the Insureds.'"  *Id.*  Because of this definition, the court noted that there had

7    to be a "meaningful distinction between a claim and a potential claim within the meaning of the

8    policy" and, "[i]n light of the overall structure of the policy, a claim is not threatened action,

9    accusation of misconduct, or mere notice of an intention to hold an insured responsible for a

10   wrongful act."  *Id.*  The policy at issue here does not refer to a "potential claim."  In any event, given

11   WZ's demand, this case is more akin to *Phoenix* and *Westrec* than *Abidafel*.

12   D.     <u>Summary Judgment v. Summary Adjudication</u>

13          For the reasons stated above, the Court finds that, based on the undisputed facts as detailed

14   above, (1) neither the August 24 nor the September 10, 2010, letter from WZ to CAMICO

15   constituted a "Claim" as that term is defined in the Catlin policy; and (2) the September 20, 2011,

16   letter from WZ to CAMICO did constitute a "Claim" made within the policy period.  The Court thus

17   finds in CAMICO's favor on these issues and grants summary adjudication thereon.  Complete

18   summary judgment in favor of CAMICO is inappropriate at this time for several reasons.

19          First, as noted above, the Court is not making any ruling as to the applicability of any

20   exclusionary clauses.[4]  Thus, the case in its entirety cannot be resolved in CAMICO's favor.

21          Second, Catlin has now raised a new issue for the Court's consideration – *i.e.*, that the claim

22   by WZ was a product of collusion between WZ and CAMICO.  *See, e.g.*, *Safeco Ins. Co. of Am. v.*

23   *Parks*, 170 Cal. App. 4th 992, 1013 (2009) (stating that "collusion occurs when the insured and the

24   third party claimant work together to manufacture a cause of action for bad faith against the insurer

25   or to inflate the third party's recovery to artificially increase damages flowing from the insurer's

26   breach"); *cf. Pryun v. Agricultural Ins. Co.*, 36 Cal. App. 4th 500, 509 (1995) (stating that when "a

27   _____

    [4]  The Court notes that the parties' briefing on the "K" exclusionary clause was fairly

28   cursory.  Should the Court be called upon to make a ruling on this clause, the parties will need to
provide more thorough and complete briefing.

liability insurer wrongfully denies coverage or refuses to provide a defense, then the insured is free

to negotiate the best possible settlement consistent with his or her interests" and "[s]uch a settlement

will raise an evidentiary presumption in favor of the insured (or the insured's assignee) with respect

to the existence and amount of the insured's liability[;] [t]he effect of such presumption is to shift

the burden of proof to the insurer to prove that the settlement was unreasonable or the product of

fraud or collusion").  If the Court were to agree with Catlin on this issue, the case in its entirety

could not be resolved in CAMICO's favor.

      In light of the above, the Court does not grant CAMICO summary judgment but rather grants

only summary adjudication on the following issues: (1) that neither the August 24 nor the September

10, 2010, letter from WZ to CAMICO constituted a "Claim" as that term is defined in the Catlin

policy; and (2) that the September 20, 2011, letter from WZ to CAMICO did constitute a "Claim,"

more specifically, one made within the policy period.

      The Court also finds that Catlin's Rule 56(d) request for discovery on the issue of collusion

is appropriate.  As detailed in Section II.F, *infra*, there were communications between WZ and

CAMICO in August 2011 that arguably suggest that the two were assisting one another in ensuring

that there would be coverage under the Catlin policy.

### III.   CONCLUSION

      For the foregoing reasons, the Court declines to grant summary judgment in favor of either

party but grants CAMICO summary adjudication on the following issues: (1) that neither the August

24 nor the September 10, 2010, letter from WZ to CAMICO constituted a "Claim" as that term is

defined in the Catlin policy; and (2) that the September 20, 2011, letter from WZ to CAMICO did

///

///

///

///

///

///

///

United States District Court
For the Northern District of California

constitute a "Claim," more specifically, one made within the policy period.  The Court grants Catlin discovery on the issue of collusion and directs the parties to meet and confer on an expedited discovery plan under Rule 56(d) and on a post-discovery briefing schedule (one supplemental brief per side) addressing collusion and exclusionary clauses.

This order disposes of Docket Nos. 26 and 28.

IT IS SO ORDERED.

Dated:  September 13, 2012

_____
EDWARD M. CHEN
United States District Judge